UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ANTHONY CARTY,                                          :
                                                        :
                Plaintiff,                    :
                                                        :  MEMORANDUM
   -against-                                           :  AND ORDER
                                                        :  15-CV-4755 (SMG)
CITY OF NEW YORK, P.O. RONALD CAPURSI, P.O.             :
PATRICK O'NEILL, P.O. SEAN DAWSON, and P.O.             :
JANINE SARTINI,                                         :
                                                        :
                Defendants.                   :
------------------------------------------------------------------x
GOLD, STEVEN M., U.S. Magistrate Judge:

      Plaintiff Anthony Carty brings this action pursuant to 42 U.S.C. § 1983 and New York State common law alleging that defendants, New York City Police Officers Capursi, O'Neill, Dawson and Sartini,[1] used excessive force and assaulted him when taking him into custody. The case was tried before this Court, without a jury, on September 25 and 26, 2017. The Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52 are set forth in narrative form below. *See* 9 *Moore's Federal Practice* § 52.13[1].

## FACTS

      Many of facts underlying this case are undisputed. The evidence presented by the parties at trial differed primarily with respect to the physical interaction between the defendant officers and plaintiff Carty during the ten to twenty minutes after Carty was taken into custody.

      On May 30, 2014, the defendants—then Sergeant and now Lieutenant Patrick O'Neill and police officers Ronald Capursi, Sean Dawson, and Janine Sartini—responded to a 911 call reporting an incident of domestic violence. When they arrived at the address provided to the 911 operator,

---

[1] Plaintiff's complaint also asserts claims against the City of New York, but those claims were later withdrawn. Proposed Pretrial Order at 2, Docket Entry 34.

they found Dinelly Santos waiting outdoors. The officers testified that Santos, who was crying, told them that Carty had punched and choked her. The officers observed what appeared to be red marks and swelling on Santos's neck.

Santos refers to plaintiff Carty as her husband, although the trial testimony suggests that they are not legally married. Santos and Carty are the parents of a young girl who was two years old on the date in question.

Santos told the officers that Carty was inside of the apartment they shared, and pointed the apartment out to them. The officers proceeded to the apartment with the intention of placing plaintiff under arrest for assaulting Santos. They found Carty in the apartment, holding his daughter. According to the officers, Carty was calm and, at least after repeated requests, agreed to put his daughter down. Carty was then rear-cuffed without incident and escorted from the building by defendants O'Neill and Dawson.

To exit the building, Carty and the officers went through a door. A single step was on the outside of the doorway. One step down was an alley within the apartment complex that in turn led to the street. Another step, leading up to the entrance to another portion of the apartment complex, was across the alley from the doorway leading to plaintiff's portion of the building. A photograph of the area received in evidence at trial indicates that the steps and the surface of the alley were made of concrete. Pl. Ex. 18.

The parties' versions of what took place once Carty and the defendant officers left Carty's apartment building diverge. They agree, however, that a physical altercation took place, and that Carty was ultimately placed in restraints and taken by ambulance to Richmond University Medical Center.

*Plaintiff's Version of Events*

According to Carty, as he was being escorted, rear-cuffed, outside of his building, he tripped on the step just outside of the doorway to his apartment. When he lost his balance, he inadvertently

struck one of the arresting officers in the head with his own head and shoulder. After that, what Carty described as a melee ensued. Carty testified that he ended up on the ground, with his head on the concrete step across the alley and the rest of his body lying in the alley itself. Carty's face was turned on its side, and his stomach was on the concrete surface of the alley. Carty claimed in his testimony that he was punched in his face, shoulder, and torso more than fifteen times. He described at least some of the punches as "haymakers," or strikes administered with full force and momentum after reaching back as far as possible. Carty also described how, on three occasions, officers lifted his head off the concrete and banged it into the step. According to Carty, his neck and chest were from time to time pressed against the edge of the step, and he was constantly squirming and trying to move to relieve the pressure on these parts of his body. Carty claimed that he told the officers that he was having trouble breathing, but it did not stop them from continuing their assault. Carty described being struck while officers held his head on the step and his body in the alley for twenty to thirty minutes. The beating continued until Carty was placed in a restraint bag. According to Carty, he could not see through the bag and feared he would die once placed inside of it. Carty was then transported to the hospital.

Carty called two witnesses to corroborate his version of the events: Clayton Howard, a neighbor, and Dinelly Santos, the mother of his young child and the victim of his assault.

Clayton Howard testified that he was sitting outside when he saw the defendants enter Carty's apartment and then come out with Carty, who was rear-cuffed. Howard saw the officers push Carty to the ground, pile up on top of him, and hold him down with their hands and knees. Howard testified that he saw Carty with his head and chest on the step and his belly hanging off of it, and heard Carty tell the officers that he had asthma and could not breathe. Howard did not see Carty trip or lose his balance, and testified that it appeared the officers simply decided to take Carty to the ground after Carty walked out of the doorway for no apparent reason.

3

Dinnelly Santos provided a description of the events at issue that matched Carty's in several respects. Santos testified that she saw the defendant officers jump on Carty and punch him in the face. According to Santos, Carty was punched in the face more than ten times. Like Howard, Santos testified that she heard Carty say that he could not breathe.

*Defendants' Version of Events*

Defendant O'Neill testified that he led Carty from his apartment and through the doorway to the alley, and that defendant Dawson followed Carty out. As the three men were leaving the building, Carty began walking quickly. O'Neill then put his hand on Carty's chest to slow him down.

At about this point, Carty became irate and began to scream. Carty's shouts were directed in particular to Santos, who was still outside, and to whom he yelled, "why did you do this?" After screaming at his wife, Carty lowered his body, looked straight at O'Neill, and head-butted him. Apparently having seen or heard what happened, defendant Capursi then approached. Carty then head-butted Capursi, striking Capursi in the face and drawing blood. The group—Carty, O'Neill, Dawson, and Capursi—then fell together to the ground. Soon thereafter, defendant Sartini joined her fellow officers as they attempted to restrain Carty. Carty was violently kicking, spitting, and screaming and continued to do so despite the efforts of the officers. At some point, O'Neill got up and called for assistance from the NYPD's Emergency Services Unit, or ESU. O'Neill testified that he never heard Carty claim he could not breathe, and that Carty was in fact yelling and screaming the entire time he was held on the ground, thus indicating he was not struggling for air.

Defendant Capursi testified that Carty head-butted him, striking his forehead. Once on the ground, Carty continued to spit and kick, and the officers had difficulty getting him under control. For that reason, Capursi acknowledged, he struck Carty in the face approximately three times with a closed fist.

4

Sartini and Dawson testified consistently with O'Neill and Capursi, although they observed only some of the critical events. Sartini described seeing Capursi bleeding from his head, running over to help, and observing Carty on the ground, kicking and screaming. According to Sartini, she tried to calm Carty down. Although Carty did become quiet on one or more occasions for a minute or two, each time he quickly reverted to kicking and screaming. Dawson described how Carty head-butted O'Neill and then Capursi, how the three officers and Carty then fell to the ground, and how he could not get control over Carty's legs despite his efforts to do so.

Defendants also called Detective Nicholas Gentile, the ESU officer who responded to defendant O'Neill's call for assistance. Gentile testified that he arrived at the scene and saw Carty propped up against a wall. Carty seemed irate and confused. The only injury Gentile saw as he looked at Carty was a laceration on the side of Carty's face. Gentile tried to calm Carty down by speaking to him, but Carty remained too anxious to walk on his own to the ambulance that had by then arrived at the scene. When officers tried to lift Carty off the ground and guide him to the ambulance, Carty pushed them away and sat back down. Gentile tried to wrap Velcro straps around Carty's legs, but Carty was kicking and moving about too much for that to be possible. Finally, Gentile decided that it was necessary to use a nylon mesh restraint bag. The bag, which was available for inspection at trial, does not have zippers and does not cover the face of the person restrained.

As noted above, plaintiff was taken to Richmond University Medical Center ("RU") once he was restrained. The records of plaintiff's treatment in the emergency room there were received in evidence at trial. Pl. Ex. 25. While neither side called a doctor or other professional to testify about the contents of the records, many of the entries in them do not require expertise to understand.

According to the RU records, plaintiff arrived at the hospital "noncooperative and refusing to answer questions. Yelling at staff." Pl. Ex. 25 at DEF000408. The records also indicate that

plaintiff told the medical staff that police officers slammed his head into a door frame and struck him with a radio. *Id*.

The RU records also report that plaintiff arrived alert, awake and in no apparent distress. *Id*. Although he complained of pain on the left side of his face, the medical records reveal that Carty made no complaints of loss of consciousness, severe headache, neck pain, chest pain, abdominal pain or back pain. *Id*. Examination revealed no tenderness on plaintiff's chest or back. *Id.* Medical professionals did observe soft tissue swelling on both sides of plaintiff's face and an abrasion over his left eyebrow. Pl. Ex. 25 at DEF000408-09. Carty was also diagnosed with a concussion. Pl. Ex. 25 at DEF000404.

The emergency room records conclude that plaintiff's examination revealed "no evidence of serious head injury, neurologic injury, chest or abdominal injury." Pl. Ex. 25 at DEF000409. A laceration over plaintiff's right eyebrow was treated with sterile adhesive strips; apparently, no stitches were necessary. Pl. Ex. 25 at DEF000410.

## DISCUSSION

A claim that law enforcement officers used excessive force in the course of making an arrest invokes the protections of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use *some* degree of physical coercion or threat thereof to effect it." *Soto v. Gaudet*, 862 F.3d 148, 158 (2d Cir. 2017) (quoting *Graham*, 490 U.S. at 396 (emphasis added)). Whether a constitutionally tolerable amount of force was used in a particular situation is measured by a standard of "reasonableness." *Graham*, 490 U.S. at 395. Thus, in determining whether law enforcement officers used excessive force, "all that matters is whether [the defendant's] actions were reasonable." *Scott v. Harris*, 550 U.S. 372, 383 (2007).

6

To determine whether the force used to effectuate an arrest was reasonable, a court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). The test "is not capable of precise definition or mechanical application, . . . [but] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (internal citations and quotation marks omitted). Crucially, the reasonableness inquiry is conducted "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (quoting *Graham*, 490 U.S. at 396). The inquiry also "must account for 'the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Estate of Jaquez by Pub. Adm'r of Bronx Cty. v. City of New York*, 2017 WL 3951759, at *2 (2d Cir. Sept. 8, 2017) (quoting *Graham*, 490 U.S. at 397).

Carty describes an aggressive, gratuitous assault during which his head was slammed into a concrete step three times and he was punched in the face by an officer more than ten times while his face rested on a concrete step. The use of force described by Carty was plainly unreasonable.

Defendants, in contrast, claim they used limited, measured force that was necessary to restrain Carty and take him into custody and, if necessary, transport him to a hospital. It is undisputed that the officers had reason to believe that Carty had just committed a serious violent crime—choking and punching the mother of his young child. According to the defendants, moreover, Carty deliberately struck two of the defendants in the head and was vigorously resisting arrest. For these reasons, if defendants' version of the circumstances they confronted and the extent

7

of the force they used in response is accepted, it follows that their use of force was reasonable and did not violate Carty's Fourth Amendment rights.

As discussed below, defendants' version is corroborated by the records of Carty's treatment at the RU emergency room and by the testimony of a non-party witness. Moreover, plaintiff's credibility was challenged in several respects. Accordingly, and having carefully considered all of the evidence presented at trial, the Court credits defendants' version of the relevant events.

The degree of injury reflected in plaintiff's medical records is far more consistent with defendants' version of events than with plaintiff's claim that officers lifted his head and banged it into a concrete step three times, that an officer punched him in the face, at least on some occasions with all his might, ten or more times, and that his chest and neck were pressed so hard into the edge of a concrete step as he squirmed about that he struggled for air. As noted above, those records indicate that plaintiff arrived at the emergency room alert, awake, and in no apparent distress. Emergency room personnel noted no abrasions or redness on plaintiff's neck or chest, and plaintiff made no complaints of neck, back, chest or abdominal pain. The records contain no indication that plaintiff sustained a fracture of any bone or a broken nose, split lip, or chipped tooth. This hardly seems possible if, as Carty claims, an officer punched him in the face with all the officer's might approximately ten times, while his face rested on a concrete step, and if officers lifted his head and slammed it into that step as many as three times. The hospital records also corroborate, at least to some extent, the testimony of the officers that Carty was violent and resisting, in that they report that Carty was uncooperative and yelled at hospital staff.

Detective Gentile's testimony also corroborated defendants' version of events. In considering that testimony, the Court recognizes that Detective Gentile, like the defendants, is an officer of the NYPD; however, he was not assigned to the same precinct as the defendants at the time of the events in issue and did not know the defendants personally. Moreover, his demeanor was entirely credible. Detective Gentile's description of the difficulty he encountered when he attempted

to calm plaintiff down and lead him to the ambulance corroborates defendants' contention that they could not subdue plaintiff without resorting to the use of significant force. In addition, Detective Gentile's demonstration of how the restraint bag is used calls into question the credibility of plaintiff's testimony that he could not see once he was restrained.

Carty's credibility was also damaged during his own testimony at trial. For example, Carty acknowledged a criminal history that includes three felony convictions. Moreover, at a hearing held before trial pursuant to New York General Municipal Law § 50-h, Carty understated the extent of his criminal record, claiming he had only three convictions when in fact his record is significantly more extensive than that. Tr. of July 20, 2015 at 8-9. At trial, Carty attempted to explain away his misstatement by claiming that he understood the question posed at the Section 50-h hearing to be asking only about felony convictions. However, later in the same 50-h transcript, Carty testified that each of the three convictions he had just acknowledged was for a misdemeanor, demonstrating that the explanation he offered at trial was not accurate. Tr. of July 20, 2015 at 10. Finally, although Carty denied punching Santos on the night at issue when he testified at trial, he pled guilty to assaulting her, and admitted punching her when he entered his guilty plea. Def. Ex. U at 10.

The witnesses called by Carty at trial did little to help his case. The Court completely discounts the testimony of Dinelly Santos because of her demeanor and inconsistencies between her trial testimony and certain documents offered at trial. While Clayton Howard appeared to be a credible witness, his testimony was not particularly damaging to defendants. Although Howard did testify that he heard plaintiff complain that he could not breathe, it is clear that plaintiff did not suffocate or sustain any injury from choking or having his breathing interrupted. Howard also testified that he saw officers piled on top of plaintiff, but he likely was not in a position to observe whether the officers were attempting to restrain a violent, resisting arrestee or gratuitously subjecting plaintiff to unnecessary force.

## CONCLUSION

For the reasons stated above, the Court finds that Carty has failed to establish his claims by a preponderance of the evidence, and that judgment should enter in favor of defendants. The Clerk of Court is directed to enter judgment accordingly.

**SO ORDERED.**

_____/s/_____
**STEVEN M. GOLD**
**United States Magistrate Judge**

Brooklyn, New York
October 16, 2017

U:\#VAR 2017-2018\Carty v. City of New York et al\Carty M&O FINAL.docx